JUNE MELODY BALLANCE, A MINOR v. DR. IRL J. WENTZ, DR. J. R. DINEEN AND NEW HANOVER MEMORIAL HOSPITAL, INC.

No. 745SC273

(Filed 17 July 1974)

1. **Physicians and Surgeons § 17— treatment of arm fracture with traction — standard of care — sufficiency of evidence**

    In an action to recover damages for personal injuries suffered by plaintiff allegedly caused by the negligence of defendant doctors in treating her injury with traction, the trial court properly granted directed verdict for defendants where plaintiff offered no evidence as to what constitutes good orthopedic practice in the application, treatment, care, and supervision of traction, and thereby failed to establish the standard of care required of defendant doctors.

2. **Physicians and Surgeons § 16— arm fracture — traction treatment — res ipsa loquitur inapplicable**

    *Res ipsa loquitur* was inapplicable in plaintiff's action to recover for defendants' alleged negligence in treating her arm fracture with traction.

    Judge CARSON dissenting.

APPEAL by plaintiff from *Peel, Judge,* 4 September 1973 Session of Superior Court held in NEW HANOVER County. Heard in the Court of Appeals 19 April 1974.

This is a civil action instituted by Evelyn M. Ballance, guardian ad litem for plaintiff, June Melody Ballance, a minor, to recover damages for alleged personal injuries suffered by the minor and allegedly caused by the negligence of the defendants, Dr. Irl J. Wentz and Dr. J. R. Dineen, attending physicians, and also by the negligence of the agents of New Hanover Memorial Hospital, Inc.

On 5 March 1971, the plaintiff filed her complaint containing the following pertinent allegations:

"VII. That on or about October 15, 1969, the minor plaintiff, June Melody Ballance, suffered a fracture, with displacement, of her upper right arm and was admitted as an in-patient in the corporate defendant's hospital under the care and treatment of the defendants; that the fracture was treated by traction.

VIII. That on or about the 2nd day of November, 1969, while the minor plaintiff was still hospitalized at the hos-

pital under the care and treatment of the defendants and their staffs and while the minor plaintiff's right arm was in traction, and after the fracture of the right arm had properly relocated and was properly healing, the traction apparatus broke or came loose causing the minor plaintiff to suffer a refracture with displacement of the right arm.

IX. That the defendants and their agents were careless and negligent in that:

(1) They failed to properly place the arm in traction and failed to install the traction so that it would not break or come loose from the arm;

(2) They failed to maintain proper care and supervision over the traction and the arm;

(3) They neglected to take necessary steps to correct defects in the traction after being warned that the traction was coming loose; and

(4) They taped the arm of the plaintiff to the traction in a negligent and careless manner.

X. That the joint and concurrent negligence of the defendants and their staffs was the proximate cause of the injury to the plaintiff as herein stated.

XI. That, as a result of the carelessness and negligence of the defendants and their agents, and, as a result of the arm falling from traction, surgery had to be performed on the plaintiff, leaving the plaintiff with a permanent and extremely noticeable scar, additional hospitalization and hospital and medical expenses were required, the plaintiff had to and will have to suffer severe pain which she would not otherwise have had to suffer, the plaintiff has and will suffer extreme embarrassment and mental anguish from the scar for the remainder of her life and her suffered damages are in the amount of $45,000.00."

The defendants filed answers denying any negligence on their part.

At trial the plaintiff offered evidence which tended to establish the following:

On 15 October 1969, June Melody Ballance, the minor plaintiff, fell from a ladder and suffered an injury to her right arm

and shoulder. The child was taken to the emergency room of New Hanover Memorial Hospital and was treated by defendant Dr. Irl J. Wentz, an orthopedic surgeon. Dr. Wentz admitted the child to the hospital upon diagnosing her injury as "a severe fracture with displacement upper shaft of the humerus, right shoulder," and by his own testimony treated the child in the following manner:

> "After I rendered my diagnosos (sic), I recommended that skeletal traction be utilized by placing a steinmann pin through the ulna. That is, through the skin on one side and out the skin on the other side so that we could apply a traction bow instrument used to attach to a pin while it is through a bone. * * *

> After this was done, she was put in a hospital bed, the traction was rigged. In other words, we attached a rope to the traction bow and the rope went through some pulleys and a weight was attached to the pin, to the rope leading from the pin. We also applied some other traction material to the forearm. This material is a sticky, porous type bandage that sticks very readily to the skin and is wrapped with an elastic bandage to help hold it in place. Through this traction bandage another rope is attached again to other pulleys and a much lesser amount of weight is attached simply to keep the arm upright. * * * "

The patient remained in the skeletal traction from 15 October 1969, until 3 November 1969. During this period of time portable X-ray films were taken of plaintiff's arm to monitor the progress of the healing. Based on their reading of the X-ray films the doctors believed that the healing was progressing as expected; and on 29 October 1969, the patient and her parents were informed that the patient would be placed in a shoulder spica cast within the next few days.

On 2 November 1969 the skin traction on plaintiff's arm slipped off causing her arm to rotate from right to left with her right hand landing on her left shoulder. The minor plaintiff testified that the falling of the traction caused her severe pain. After the traction fell, Dr. Dineen, Dr. Wentz's partner, was notified of the incident and he instructed a nurse to reapply the traction. No X-rays were taken at that time. Plaintiff, plaintiff's mother, and Margaret Elwell, a patient who shared a semi-private room in the hospital with plaintiff, each testified

that the patient had called to the attention of the doctors and nurses the fact that her traction was slipping. On one occasion prior to the slipping off of the traction, the traction was reinforced by placing tape over the bottom portion of the traction around the patient's elbow.

On 3 November 1969, the traction was removed, a spica cast was applied, and X-rays were taken which disclosed that "position on the fracture was unsatisfactory for healing." Upon making this discovery, Dr. Wentz recommended to plaintiff's parents that an open reduction procedure be performed; and this operation took place on 5 November 1969. Dr. Wentz testified that the operation disclosed that the fracture was firmly attached and healing but in an improper position. Dr. Wentz stated, "I found that there was good side-to-side healing and in order to change the fracture, I had to use sharp, orthopedic instruments. I carried out what is known as osteotomy, which by definition means 'cutting through bone.' The purpose of this was to alter the relationship of side-by-side positioning of the bone to end-to-end positioning of the bone."

Plaintiff countered Dr. Wentz's version of what happened by introducing into evidence a letter dictated by Dr. Wentz approximately one year after the surgery. This letter, in pertinent part, reads as follows:

" 'On or about 11-2-69, the skin traction portion became loosened, and slipped off. The arm was positioned on the bed for a time, and on the instruction of Dr. Dineen, my partner, the skin traction was reapplied. Dr. J. R. Dineen checked the traction on the following morning. She was not having any unusual amount of discomfort and therefore an additional X-ray film was not obtained during the period of the traction slipping off and being reapplied. I therefore went ahead with application of the shoulder spica cast and was, of course, surprised to see that a complete separation of this healing fracture had occurred, making it mandatory that some surgical treatment be instituted. She was therefore scheduled for surgery and open reduction with internal fixation, using a Rush intermedullary pin, was carried out on 11-5-69. Her postoperative course was uneventful, and she was dismissed four days later, on 11-9-69. In summary, I think that we cannot be certain as to when fracture position was lost. It could have occurred when the skin traction slipped off, particularly if she be-

---

Ballance v. Wentz

---

came frightened, and twisted her arm and shoulder in some way. The fracture could also have slipped off while in sitting position with arm to side for application of cast.' And my signature."

After introduction of this letter, Dr. Wentz testified:

"The terms that I used in this letter, including the term 'complete separation of this healing fracture,' I will repudiate at this time. I would not say that there was a complete separation. This was based on X-ray taken on November 3, 1969."

"Yes, I would also repudiate the statement, 'In summary, I think that we cannot be certain as to when fracture position was lost.' "

At the conclusion of the presentation of plaintiff's evidence, the defendants' motions for directed verdicts were allowed. From a judgment directing verdict for defendants, plaintiff appealed.

*Chambliss, Paderick, Warrick & Johnson, P.A., by J. B. Chambliss for plaintiff appellant.*

*Poisson, Barnhill, Butler & Martin by M. V. Barnhill, Jr., for defendant appellees Wentz and Dineen.*

*Hogue, Hill, Jones, Nash & Lynch by William L. Hill II, for defendant appellee New Hanover Memorial Hospital, Inc.*

HEDRICK, Judge.

The single question presented by this appeal is whether the trial court erred in granting defendants' motions for directed verdicts. Because of the involvement of multiple defendants in this suit, our consideration of the question must necessarily be two-pronged. We shall first discuss the alleged negligence of defendants, Drs. Wentz and Dineen, and conclude with a consideration of the defendant hospital's alleged negligence.

"A physician or surgeon who undertakes to render professional services must meet these requirements: (1) He must possess the degree of professional learning, skill, and ability which others similarly situated ordinarily possess; (2) he must exercise reasonable care and diligence in the application of his knowledge and skill to the patient's case; and (3) he must use his best judgment in the treatment and

care of his patient. [Citations omitted.]" *Hunt v. Bradshaw,* 242 N.C. 517, 521, 88 S.E. 2d 762 (1955).

Plaintiff does not contend that Drs. Wentz and Dineen do not possess the requisite knowledge and skill of others similarly situated; however, she does argue that the doctors did not exercise reasonable care and diligence in the application of their knowledge and skill and that they did not use their best judgment in the treatment and care of the minor plaintiff.

[1] The standard of care required of a physician or surgeon is a matter involving highly specialized knowledge with respect to which a layman can have no reliable information. For this reason, both the court and the jury must usually be dependent on expert testimony to establish the standard of care. *Jackson v. Sanitarium,* 234 N.C. 222, 67 S.E. 2d 57 (1951). Herein lies the fatal flaw in plaintiff's case against the defendant doctors. At no point in the record does there appear to be an attempt by plaintiff to establish what constitutes good orthopedic practice in the application, treatment, care, and supervision of the traction. Neither of plaintiff's medical experts—Dr. Wentz and Dr. Dorman—testified as to the standard of care exercised by other orthopedic doctors in treating patients with similar problems. Thus, the plaintiff having failed to establish by expert testimony the standard of care to be exercised by the defendant doctors, it follows *a fortiori* that plaintiff has shown no negligence on defendants' part.

[2] Furthermore, the plaintiff's contention that the doctrine of *res ipsa loquitur* applies is without merit, because we do not view this case as one which is susceptible to the application of that doctrine. Although the use of the *res ipsa loquitur* doctrine in medical malpractice cases has been approved in several decisions of our Supreme Court, see *Mitchell v. Saunders,* 219 N.C. 178, 13 S.E. 2d 242 (1941); *Pendergraft v. Royster,* 203 N.C. 384, 166 S.E. 285 (1932), we feel the following statement by Justice Higgins in *Watson v. Clutts,* 262 N.C. 153, 136 S.E. 2d 617 (1964) is applicable to the case at bar:

> "The decisions of this Court generally hold that liability in malpractice cases must be based on proof of actionable negligence. The doctrine [of] *res ipsa loquitur* cannot be relied on to supply deficiencies in proof."

With regard to the hospital's negligence, we are of the opinion that the plaintiff failed to establish any negligence on

the part of the hospital. Again, also the doctrine of *res ipsa loquitur* has no application.

All parties have devoted a considerable portion of their briefs to arguing their respective contentions as to whether plaintiff's evidence tends to show that the slipping of the skeletal traction was a proximate cause of any additional injuries suffered by the minor plaintiff. Our decision holding that the evidence fails to disclose any negligence upon the part of any of the defendants with respect to the use of the skeletal traction in treating plaintiff's injuries makes it unnecessary for us to discuss this aspect of the case.

For the reasons stated, the judgment appealed from is

Affirmed.

Judge BRITT concurs.

Judge CARSON dissents.

Judge CARSON dissenting:

While the majority opinion correctly states the general proposition that the standard of care required of a physician or surgeon is a matter involving highly specialized knowledge with respect to which a layman can have no reliable information, and that the court and jury are usually dependent on expert testimony to establish the standard of care, there is a well recognized exception to the general rule which is more applicable to the facts in question. That is, where the lack of reasonable care and diligence in the treatment of the patient is so patent that only common knowledge and experience are required to understand and judge the action of the defendant. *Hawkins v. McCain*, 239 N.C. 160, 79 S.E. 2d 493 (1954) ; *Wilson v. Hospital*, 232 N.C. 362, 61 S.E. 2d 102 (1950). In those cases the jury is able to understand and apply the standard of the reasonable prudent man without the necessity of specialized medical knowledge.

The majority opinion cites the case of *Jackson v. Sanitarium* to support its position that expert testimony must be used to establish the standard of care. While the Jackson case discusses the general principle as applied by the majority, the actual hold-

ing is to the contrary. In writing the majority opinion, Justice Barnhill held at pp. 226-227,

> It is true it has been said that no verdict affirming malpractice can be rendered in any case without the support of medical opinion. If this doctrine is to be interpreted to mean that in no case can the failure of a physician or surgeon to exercise ordinary care in the treatment of his patient, or proximate cause, be established except by the testimony of expert witnesses, then it has been expressly rejected in this jurisdiction. (Citations omitted.)
>
> Rightly interpreted and applied, the doctrine is sound. Opinion evidence must be founded on expert knowledge. Usually, what is the standard of care required of a physician or surgeon is one concerning highly specialized knowledge with respect to which a layman can have no reliable information. As to this, both the court and jury must be dependant on expert testimony. Ordinarily there can be no other guide. For that reason, in many instances proximate cause can be established only through the medium of expert testimony. *There are others, however, where nonexpert jurors of ordinary intelligence may draw their own inferences from the facts and circumstances shown in evidence.* (Citations omitted.) (Emphasis added.)

Here, despite the plaintiff's complaint that the traction on her arm was slipping, it was allowed to give way completely and fall with sharp force. It does not take specialized medical knowledge to understand that traction, if applied, must be applied in such a manner that it does not fall. Occurrences of this nature are similar to those found in the case of *Norris v. Hospital*, 21 N.C. App. 623, 205 S.E. 2d 345 (1974), where the failure of the hospital to raise the bed railings at night for an elderly patient was held to present a jury question without expert testimony. I think that the negligence of the attending physicians and the hospital, through its agent, the nurse, was a jury question and should have been presented to the jury.

Since the majority opinion does not discuss the proximate cause aspect of this matter, I will not discuss it either. Suffice it to say that I believe that there was sufficient evidence of proximate cause to raise a question for the jury, and the directed verdict against the plaintiff should not have been entered.